# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

## APPEAL NO. 18-12615

---

**EGI-VSR, LLC,**
**Petitioner-Appellee,**

   **v.**

**JUAN CARLOS CELESTINO**
**CODERCH MITJANS,**
**Respondent-Appellant.**
_____/

**On appeal from the United States District Court Southern District of Florida, Case No. 15-cv-20098**

## APPELLANT CODERCH'S CORRECTED MOTION TO STAY MANDATE

**HomeR Bonner**

Christopher J. King
Kevin P. Jacobs
Rayda Alemán
1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida  33131
(305) 350-5192
cking@homerbonner.com

*Attorneys for Appellant*

*EGI-VSR, LLC v. Juan Carlos Celestino Coderch Mitjans*, No. 18-12615-E (11th Cir.)

USCA11 Case: 18-12615    Document: 51    Date Filed: 07/17/2020    Page: 2 of 40

## CERTIFICATE OF INTERESTED PARTIES AND
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, *et seq*., Appellant Juan Carlos

Celestino Coderch Mitjans files this Certificate of Interested Persons and Corporate

Disclosure Statement:

Alemán, Rayda—counsel for Appellant

CATREX LTDA.—party to Chile arbitration

Coderch Mitjans, Jorge—party to Chile arbitration

Coderch Mitjans, Juan Carlos Celestino—Appellant

Costa Ramirez, Vasco—Arbitrator in Chile arbitration

DICREX LTDA.—Chilean company, party to Chile arbitration

EGI-VSR, LLC.—Appellee

Fernández Ruiz, Gonzalo—counsel for EGI-VSR, LLC in Chile arbitration

Homer Bonner Jacobs, P.A.—counsel for Appellant

Homer, Peter W.—counsel for Appellant

Huber, Alexander Leslie—party to Chile arbitration

Huber, Catherine—party to Chile arbitration

Huber, Richard Leslie—party to Chile arbitration

Jacobs, Kevin P.—counsel for Appellant

Jenner & Block LLP—counsel for Appellee

i

*EGI-VSR, LLC v. Juan Carlos Celestino Coderch Mitjans*, No. 18-12615-E (11th Cir.)

USCA11 Case: 18-12615     Document: 51     Date Filed: 07/17/2020     Page: 3 of 40

King, Christopher J.—counsel for Appellant

Kozyak Tropin Throckmorton LLP—counsel for Appellee

Otazo-Reyes, Alicia M.— Southern District of Florida District Court

Magistrate Judge

Queltehue S.A.—party to Chile arbitration

Reveco Urzua, Ricardo—counsel for EGI-VSR, LLC in Chile arbitration

Rio Bonito, S.A.—party to Chile arbitration

Scola, Jr., Robert N.—Southern District of Florida District Court Judge

Shaw-Wilder, Detra—counsel for Appellee

Trask, Gregory J.—counsel for Appellant

Vail, Andrew W.—counsel for Appellee

Valdes Correa, Salvador—counsel for EGI-VSR, LLC in Chile arbitration

Vergara Varas, Pedro Pablo—counsel for Jorge Coderch Mitjans, Juan Carlos

Celestino Coderch Mitjans, Rio Bonito, S.A., Queltehue, S.A., World Wines, Corp.,

Winecorp S.A., in Chile arbitration

Winecorp S.A.—party to Chile arbitration

World Wines Corp.—party to Chile arbitration

Appellant certifies that, to the best of his knowledge and belief, no publicly

traded company has an interest in the outcome of the case or this appeal.

ii

Pursuant to Federal Rule of Appellate Procedure 41(d)(1) and Eleventh Circuit Rule 41-1(a), Appellant Juan Carlos Celestino Coderch Mitjans ("Coderch") respectfully moves to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court of the United States.[1]

The decision in this case, affirming confirmation of an international arbitration award but vacating on other grounds, raises a substantial question meriting Supreme Court review. Mr. Coderch appealed an order confirming a Chilean arbitration award that directed him, and numerous other parties, to purchase shares in a Chilean wine company under a contractual put right, but which left several unresolved, material, and arbitrable disputes over the purchase price. Br. at 12. This Court held those disputes did not bar confirmation of the award under the Federal Arbitration Act ("FAA") as they could be decided by the district court, rather than the arbitrator, through application of "U.S. law"—specifically the "breach day" rule used for converting foreign judgments to U.S. dollars. *See EGI-VSR, LLC v. Coderch Mitjans*, 18-12615, 2020 WL 3467394, at *7 (11th Cir. June 25, 2020), slip op. at 19, attached hereto. This Court nonetheless vacated the district court's order confirming the award, finding the district court miscalculated the purchase price and

---

[1] Mr. Coderch submits this corrected motion to comply with 11th Cir. R. 27-1(a)(3), attaching a copy of the opinion, and (11), adding record cites.

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

erroneously entered a money judgment rather than an order of specific performance. *Id*. at *8. The substantial question to be presented to the Supreme Court is straightforward and purely legal:

> Whether a court rather than the arbitrator may decide a substantive arbitrable dispute in the course of confirming an arbitration award under the Inter-American Convention on International Commercial Arbitration (the "Panama Convention"), when the arbitration award left the issue unresolved.

Mr. Coderch submits that, given the Supreme Court's continued and strong interest in enforcing arbitration agreements under the FAA, particularly in the context of international arbitration, it is reasonably likely at least four Justices would vote to review this question. This Court should stay the mandate accordingly.

**A. The question presented from this appeal is substantial, and a reasonable probability exists that the Supreme Court would grant certiorari.**

Federal Rule of Appellate Procedure 41 allows Mr. Coderch to "move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court." F.R.A.P. 41(d)(1). Under Eleventh Circuit Rule 41-1, the Court may grant the motion if Mr. Coderch shows it is "not frivolous, not filed merely for delay, and shows that a substantial question is to be presented to the Supreme Court or otherwise sets forth good cause for a stay." *See* 11th Cir. R. 41-1(a). Mr. Coderch satisfies that standard here, as the decision raises a vitally important and recurring

2

question the Supreme Court has shown an abiding interest in addressing—the extent that courts may decide questions the parties agreed to arbitrate.

The Supreme Court frequently grants certiorari in cases involving the FAA, often to emphasize the emphatic federal policy that "courts must 'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citation omitted); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). The rigorous enforcement of arbitration agreements thus remains a critical part of the United States legal system, and the Supreme Court has granted review of cases that have challenged these principles term after term.

The policy of promoting the FAA's stated purpose of enforcing arbitration agreements has particular importance in international arbitration. Just last month the Supreme Court reversed a decision from this Court that held nonsignatories could not be compelled to arbitration under Chapter 2 of the FAA, which incorporates the New York Convention. Nonsignatories traditionally may be compelled to arbitrate under Chapter 1 of the FAA, and the Supreme Court held nothing in the New York Convention addressed, and therefore could have conflicted with, that domestic law. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA,*

3

*LLC*, 140 S. Ct. 1637, 1645 (2020). *GE Energy*'s pro-arbitration outcome is relevant

here, if for no other reason than it demonstrates the Supreme Court's determined

interest in ensuring enforcement of arbitration agreements, even ones (or especially

ones) controlled by foreign treaties.

In 2014, the Supreme Court decided a similar issue to the one presented in this

case. *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25 (2014) reviewed the

reversal of an order confirming an international arbitration award under the New

York Convention. The D.C. Circuit in *BG Group* had conducted a *de novo* review of

a "local litigation requirement" contained in an investment treaty between the

United Kingdom and Argentina and had decided that the failure to comply with the

requirement deprived the arbitrators of jurisdiction. *Id*. at 32. The Supreme Court

granted certiorari to decide "who—court or arbitrator—bears primary responsibility

for interpreting and applying the local litigation requirement to an underlying

controversy?" The Supreme Court held "the matter is for the arbitrators, and courts

must review their determinations with deference." *Id*. at 29. The Supreme Court

granted the petition in *BG Group* specifically because of "the importance of the

matter for international commercial arbitration." *Id*. at 32. The decision stressed that

importance throughout. In rejecting the dissent's argument that treaties warrant "a

different kind of analysis" than domestic agreements to arbitrate, the Court

4

observed, "[t]hat is a matter of some concern in a world where foreign investment and related arbitration treaties increasingly matter." *Id*. at 42.

This case, involving international investment (in a Chilean wine company) and a related arbitration agreement and treaty (the Panama Convention), implicates the same matter of great importance. And it raises the same essential issue—*who* decides, court or arbitrator, a particular dispute—specifically, a dispute over the effect of an award enforcing a put right but not calculating a purchase price. To be sure, this Court did not conduct *de novo* review of the arbitrator's calculations. The arbitrator did not perform any calculations. Doc 1-5 at 103-04. But the fact that this Court decided the disputes over the calculation in the first instance, rather than in *de novo* review of the arbitrator's decision as in *BG Group*, is a distinction without a difference. If the calculation of the purchase price is an issue for the arbitrator to decide, the Court should not have delved into the merits under any circumstances.

The consistent theme in both *GE Energy* and *BG Group* is that the same emphatically pro-arbitration policies underlying domestic arbitration agreements under Chapter 1 of the FAA govern international arbitration. The Supreme Court has on multiple occasions policed the boundary between what issues arbitrators must decide and those a court may decide. When it comes to merits issues, questions of procedure, and other matters unmistakably designated to the arbitrator, court

5

intrusion on the arbitrator's territory is strictly forbidden. *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (recognizing "a court may not rule on the potential merits of the underlying claim that is assigned by contract to an arbitrator, even if it appears to the court to be frivolous.") (internal quotes omitted) (citing *AT&T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649–650 (1986) (holding a court has "'no business weighing the merits of the grievance because the agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious." (internal quotes omitted) (quoting *Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 568 (1960)).

The decision in this case conflicts with these decisions. Holding the district court may apply U.S. law to decide debatable questions over the purchase price of shares thwarts the parties' arbitration agreement in two ways. Most directly it deprives Mr. Coderch of his ability to arbitrate disputes arising from the Shareholder's Agreement. And it substitutes U.S. law for determining that price in place of Chilean law, as the parties agreed, *see* Doc. 1-3 at ¶ 18. This case thus creates an exception to the rule against courts deciding merits questions under the FAA, "unnecessarily complicating the law and breeding litigation from a statute that seeks to avoid it." *Allied-Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 275 (1995).

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

This case is an ideal vehicle for Supreme Court review. The issue is a purely legal question over whether the rule against court determination of merits issues may be relaxed when a party seeks confirmation of an award but the arbitrator has left material disputes unresolved. EGI concedes that disputes over the purchase price of the relevant shares are arbitrable under the agreement. *See* Appellee br. at 31. What factual issues exist are the very arbitrable ones Mr. Coderch maintains must be decided by the arbitrator. And the issue is likely to recur. Allowing U.S. court determination of left-over merits issues from international arbitrations encourages parties to seek confirmation of partial or incomplete awards in federal courts under the FAA, with the full benefits and remedies of U.S. law at their disposal.

These issues are, as *BG Group* emphasized, important, as they arise from international investment and arbitration. The Supreme Court has to date authorized no exception to the enforcement of arbitration agreements when arbitrability is uncontested, even when the arguments are frivolous. *Henry Schein*, 139 S. Ct. at 529. The question Mr. Coderch has to present on a petition for certiorari is therefore substantial, and a reasonable probability exists that at least four Justices would vote to grant certiorari.

7

**B. This motion is not for delay, and Mr. Coderch will suffer irreparable harm without a stay.**

The mandate will require Mr. Coderch to litigate the purchase price of the put right on remand in the district court. But it is an issue he has from the very beginning maintained must be determined by an arbitrator in Chile, under Chilean law, and not by a federal judge in Miami. Without a stay, Mr. Coderch will be denied his contractual right to arbitrate. As this Court has long recognized, the deprivation of a bargained-for right to arbitration cannot be fully remedied by an eventual order compelling arbitration. This Court mandates a stay "[w]hen a litigant files a motion to stay litigation in the district court pending an appeal from the denial of a motion to compel arbitration … so long as the appeal is nonfrivolous." *Blinco v. Green Tree Servicing, LLC*, 366 F.3d 1249, 1253 (11th Cir. 2004). That this is a motion to stay in this Court rather than in the district court pending appeal does not diminish the policies underlying *Blinco*. *See id*. at 1252 (reasoning "[w]hether the litigation may go forward in the district court is precisely what the court of appeals must decide") (citation omitted). *Blinco* specifically contemplates that its stay procedures apply "in this Court." If the grounds are "non-frivolous, then this Court should stay the litigation in the district court pending the appeal of the denial of the motion to compel arbitration." *Id*. at 1253. That the "appeal" here

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

would be a petition for a writ of certiorari to the Supreme Court should make no difference.

Congress has implicitly recognized the irreparable nature of the harm Mr. Coderch faces by authorizing immediate appeals from a district court decision that "refus[es] a stay of any action under section 3" of the FAA, "den[ies] a petition under section 4 of [the FAA] to order arbitration to proceed," or "den[ies] an application under section 206 [of the FAA] to compel arbitration," while prohibiting appeals from orders granting motions to compel arbitration. 9 U.S.C. § 16(a)(1)(A)-(C). That asymmetrical regime exists to "avoid[] the possibility that a litigant seeking to invoke his arbitration rights will have to endur[e] a full trial on the underlying controversy before [he] can receive a definitive ruling on whether [he] was legally obligated to participate in such a trial in the first instance." *See Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 214 (3d Cir. 2007) (internal quotes and citation omitted; alteration in original). If a party "must undergo the expense and delay of a trial before being able to appeal, the advantages of arbitration—speed and economy—are lost forever." *Alascom, Inc. v. ITT North Electric Co.*, 727 F.2d 1419, 1422 (9th Cir. 1984); *see Blinco*, 366 F.3d at 1252. Mr. Coderch will suffer precisely that harm if the mandate is not stayed and proceedings in the district court go forward while he seeks review in the Supreme Court.

9

The harm to EGI, in contrast, would be minimal. EGI has had two years to collect on the original money judgment, which the decision vacates. In that time, EGI has instigated substantial litigation that has included garnishment proceedings in multiple states and a Supplemental Complaint, and obtained wide ranging discovery in aid of execution against Mr. Coderch and other unrelated entities. The fruits of that information-gathering cannot be undone now. A five or six month stay pending a Supreme Court decision on his petition for a writ of certiorari would cost EGI nothing. Accordingly, a stay is appropriate.

**C. Conclusion.**

The Supreme Court automatically extended the time to file a petition for a writ of certiorari to 150 days from the date of the judgment due to the COVID-19 crisis. *See* Order, 589 U.S.__ (March 19, 2020). Mr. Coderch therefore respectfully requests that this Court grant this motion and stay the mandate for 150 days from the opinion, November 23, 2020, or until the Supreme Court rules on the petition or decides the question presented. *See* F.R.A.P. 41(d)(2) ("The stay must not exceed 90 days, unless … the party who obtained the stay notifies the circuit clerk in writing within the period of the stay: (i) that the time for filing a petition has been extended, in which case the stay continues for the extended period….").

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Counsel for Appellant Juan Carlos Celestino Coderch Mitjans hereby submits its Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements pursuant to Fed. R. App. P. 32(a), and certify:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(a) because the motion contains 2,310 words.

2. This motion complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font, Times New Roman.

DATED: July 17, 2020.

11

Respectfully submitted:



Attorneys for Appellant
1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida  33131
Phone:  (305) 350-5192
Fax:  (305) 982-0069

By: *s/ Christopher J. King*
        Christopher J. King
        Email:  cking@homerbonner.com
        Florida Bar No: 0123919
        Kevin P. Jacobs
        Email: kjacobs@homerbonner.com
        Florida Bar No: 169821
        Rayda Alemán
        Email: raleman@homerbonner.com
        Florida Bar No: 0017386

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2020, I served the foregoing motion on

Detra Shaw-Wilder (dps@kttlaw.com), Dwayne A. Robinson

(drobinson@kttlaw.com), and Andrew W. Vail (avail@jenner.com), counsel for

the EGI-VSR, LLC, using this Court's CM/ECF system.

        *s/ Christopher J. King*
            Christopher J. King

Homer Bonner Jacobs Ortiz, P.A.
1200 Four Seasons Tower | 1441 Brickell Avenue | Miami Florida 33131
305 350 5100 | www.homerbonner.com

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12615
_____

D.C. Docket No. 1:15-cv-20098-RNS

EGI-VSR, LLC,

Petitioner – Appellee,

versus

JUAN CARLOS CELESTINO CODERCH MITJANS,

Respondent – Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 25, 2020)

Before ROSENBAUM and TJOFLAT, Circuit Judges, and PAULEY,* District
Judge.

_____

* Honorable William H. Pauley, III, Senior United States District Judge, Southern District
of New York, sitting by designation.

TJOFLAT, Circuit Judge:

Juan Carlos Celestino Coderch Mitjans ("Mr. Coderch") appeals the District Court's order confirming a $28 million international arbitration award in favor of EGI-VSR, LLC ("EGI"). In 2012, a Chilean arbitrator resolved a dispute between EGI and Mr. Coderch arising out of a Shareholders' Agreement that was designed to protect EGI's investment in a Chilean wine company. Specifically, the arbitrator enforced a provision of the Shareholders' Agreement which gave EGI the right to sell its shares back to the controlling shareholders, including Mr. Coderch, at a premium if any of the controlling shareholders breached certain promises made to EGI in the Agreement. The arbitrator found that the controlling shareholders breached the Agreement and ordered Mr. Coderch and the other controlling shareholders to pay for all of EGI's shares at the premium price specified in the Agreement.

EGI sought to enforce the Chilean award in the U.S. District Court for the Southern District of Florida by filing a petition to confirm the international arbitration award under the Federal Arbitration Act ("FAA"). Over Mr. Coderch's objections, the District Court confirmed the award as requested by EGI. Mr. Coderch raises two errors on appeal. First, he claims that he was not properly served in Brazil under Brazilian law. Second, he argues that the District Court should not have confirmed the award because (a) it was a non-final arbitration

2

award, and (b) EGI's requested relief substantially modified the award.  We agree

with the District Court that service was proper, and that this arbitration award

should be confirmed.  However, we vacate the District Court's order and remand

with instructions to correct two errors that the Court committed in enforcing the

award.

## I.

On October 19, 2005, EGI purchased 4.24 million preferred shares in a

Chilean wine company, Viña San Rafael S.A.[1]  As part of that purchase, EGI

entered into a written Shareholders' Agreement with the controlling shareholders

of Viña San Rafael.  Relevant here, the Shareholders' Agreement provides in

Section 10 that if the controlling shareholders breach certain covenants in the

Agreement, EGI would have a "put right," meaning that EGI could force the

controlling shareholders to purchase from EGI all of EGI's shares of preferred

stock.[2]  Section 10 then fixes the price of those preferred shares at "one hundred

and three percent (103%) of the per share Preferred Liquidation Preference."

Shareholders' Agreement defines the "Preferred Liquidation Preference" as "a

---

[1] Over the next several years, EGI purchased millions of additional shares in Viña San Rafael, ultimately acquiring over 7.54 million shares—a nearly $20 million investment.

[2] EGI could "put" some or all of its shares, and retained full discretion "to revoke its exercised Put Right with respect to all or any part of the shares to be purchased anytime before such shares are effectively transferred and paid for and thereafter shall not be obligated to sell them."

liquidation preference in the amount of the Preferred Purchase Price per share, plus 4% per annum thereon (based on a 360-day year), compounded semi-annually accruing from and after the date of the Preferred Closing."[3]  "Preferred Purchase Price" is in turn defined as "the purchase price per share paid by [EGI] for the shares of Preferred Stock acquired by them pursuant to the Preferred Purchase Agreement."[4]  To make it simpler: the put price for EGI's preferred shares is equal to the original price EGI paid for those shares, plus an additional 4% per year (compounded semi-annually from the date that EGI purchased the shares), plus another 3% on top of that amount.

Additionally, under Section 11, Mr. Coderch agreed to "unconditionally and irrevocably guarantee[] the prompt payment when due and performance of the obligations and liabilities of" several of the controlling shareholder entities,

---

[3] The "Preferred Closing" is "the date of the payment of the shares of Preferred Stock issued to [EGI]," or the "Payment Date."

[4] The Preferred Purchase Agreement is not included in the record on appeal, and the Shareholders' Agreement does not otherwise indicate the purchase price per share paid by EGI for its shares of preferred stock.  But we know what EGI paid for these shares because the arbitrator listed the price in his ultimate award.  According to the award, EGI purchased its initial 4.24 million shares of preferred stock at a price per share of UF 0.0782354.  (UF is the Spanish acronym for *Unidad de Fomento*, an inflation-controlled unit of account used in Chile.)

Although the award does not walk through each of EGI's subsequent acquisitions of preferred stock, it does list the date and price of each of these purchases in its final calculation of the amount owed to EGI.  Apparently, after this initial purchase of 4.24 million shares on October 19, 2005, EGI purchased an additional 42,768 shares of preferred stock on August 2, 2006 at a price per share of UF 0.07366925; 748,435 shares of preferred stock on January 31, 2007 at a price per share of UF 0.060019; 620,508 shares of preferred stock on October 11, 2007 at a price per share of UF 0.0600191; and 1,892,738 shares of preferred stock on August 26, 2008 at a price per share of UF 0.03892127.  *See infra* p. 6.

4

including "the payment for shares of Preferred Stock purchased in connection with the exercise of the Put Right." The obligations and liabilities of the controlling shareholders under the Shareholders' Agreement are joint and several.

On October 13, 2009, EGI sought to exercise its put right, alleging several breaches of the Shareholders' Agreement by the controlling shareholders.[5] When the controlling shareholders—and Mr. Coderch, as guarantor for his companies—refused to pay for EGI's shares in accordance with Section 10, it triggered the arbitration clause of the Shareholders' Agreement, and a years-long arbitration ensued in Chile. Ultimately, on January 13, 2012, the Chilean arbitrator issued a 102-page Arbitration Award, finding that the controlling shareholders breached several sections of the Shareholders' Agreement, thus entitling EGI to exercise its put right. It ordered the controlling shareholders to purchase, within ten days, EGI's preferred shares at the price agreed to in Section 10 of the Shareholders' Agreement. It then laid out the method for calculating the purchase price with respect to each of EGI's separate acquisitions of preferred stock, tracking the language of Section 10 outlined above:

> This purchase transaction must be carried out at the price agreed to in Section 10 of the Shareholder's Agreement of Viña San Rafael S.A., that is to say:

---

[5] EGI elected to exercise its put right with respect to all of its shares, and it has never sought to revoke that put. *See supra* note 2.

a) The sum of 4,240,000 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.0782354, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from October 19, 2005.

b) The sum of 42,768 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.07366925, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from August 2, 2006.

c) The sum of 748,435 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.060019, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from January 31, 2007.

d) The quantity of 620,508 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.0600191, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from October 11, 2007.

e) The sum of 1,892,738 shares of preferred stock must be bought and paid for at a price equal to 103% of the Preferred Liquidation Price. The Preferred Liquidation Price corresponds to the amount of the Preferred Purchase Price per share, i.e., UF 0.03892127, plus 4% a year (based on a year of 360 days), compounded semi-annually, starting from August 26, 2008.

EGI filed a petition to confirm the Arbitration Award against Mr. Coderch in

the U.S. District Court for the Southern District of Florida on January 12, 2015.  In

its petition, EGI performed the calculations laid out in the Arbitration Award and

asked the District Court to direct Mr. Coderch to pay EGI $28,700,450.07.[6]  The
District Court issued a summons on March 30, 2015, and on April 20, 2015, EGI
filed a notice indicating that it had filed a request to serve process on Mr. Coderch
at his last known residence in Brazil pursuant to the Inter-American Convention on
Letters Rogatory ("Convention on Letters Rogatory"), Jan. 30, 1975, O.A.S.T.S.
No. 43, 1438 U.N.T.S. 288.

The Convention on Letters Rogatory facilitates the transmission of letters
rogatory[7] among its signatory countries, including for procedural acts such as
service of process.  Under the Convention on Letters Rogatory and the Additional
Protocol to the Inter-American Convention on Letters Rogatory ("Additional
Protocol"), May 8, 1979, O.A.S.T.S. No. 56, 1438 U.N.T.S. 372, the originating
country's Central Authority—established to carry out the country's responsibilities
under the Convention on Letters Rogatory—transmits the letters rogatory to the
destination country's Central Authority.  The Central Authority in the destination
country then executes the letters rogatory in accordance with its own laws and

---

[6] Although EGI included its calculations in an appendix to the petition, it did not specify
in the petition itself the final dollar amount it believed Mr. Coderch was obligated to pay.  EGI
later filed a more detailed calculation and a proposed judgment that listed the final purchase
price when it filed its response brief in opposition to Mr. Coderch's motions to quash and to
dismiss.

[7] "In its broader sense in international practice, the term letters rogatory denotes a formal
request from a court in which an action is pending, to a foreign court to perform some judicial
act."  22 C.F.R. § 92.54.

procedural rules.  Convention on Letters Rogatory, art. 10; Additional Protocol, art. 4.  Upon execution, the Central Authority of the destination country certifies that the letters rogatory were executed in accordance with local law and returns the executed letters rogatory to the Central Authority in the originating country.  Both the United States and Brazil are signatories to the Convention on Letters Rogatory and its Additional Protocol.

Because this process can take at least twelve months to complete, EGI moved, on May 7, 2015, for an extension of time to effectuate foreign service of process on Mr. Coderch pursuant to the Convention on Letters Rogatory.  The District Court granted EGI's request and administratively closed the case until service was carried out.

Once Brazil's Central Authority received the Letter Rogatory from the United States, it attempted, unsuccessfully, to serve Mr. Coderch multiple times at various addresses; later it dispatched a bailiff, who apparently was unable to locate Mr. Coderch at his last known address.  During the bailiff's latest attempt to serve Mr. Coderch on November 1, 2016, the bailiff was informed that Mr. Coderch was living at a *finca* (a farm) in Paraguay.  On December 5, 2016, a Paraguayan notary attempted to locate the *finca* but could not find any record of it.  So, EGI submitted a request to the Brazilian Superior Court of Justice ("STJ") to serve Mr. Coderch via a special procedure for constructive service under Brazilian law called *citação*

8

*por hora certa* ("*hora certa*"), which translates to "service of process at a designated time."

Under Articles 252 and 253 of the Brazilian Code of Civil Procedure, a Brazilian court may authorize *hora certa* service on an individual if service was attempted twice unsuccessfully and there is reason to suspect that the individual is concealing himself from service. Aff. of Pedro Oliveira da Costa, ¶¶ 11–12, nn.1–2, ECF No. 16-7; Decl. of Keith S. Rosenn, ¶¶ 19–20, ECF No. 21-3; Decl. of José Roberto dos Santos Bedaque, ¶¶ 10–12, ECF No. 30-2.[8]  To accomplish *hora certa* service, a court official must attempt to serve the summons twice at the individual's address.  da Costa Aff. ¶ 12.  If he is still unsuccessful, he must notify a family member, neighbor, or doorman at that address that he will return on the next day at a designated time to attempt service a third time.  *Id.*  If the target of service still cannot be located at the address after this third attempt at service, the official may leave a copy of the summons and complaint with a family member, neighbor, or doorman, and the target is deemed constructively served under Brazilian law.  *Id.* ¶¶ 12–15.

Here, the STJ specifically authorized *hora certa* service on Mr. Coderch. The bailiff returned to Mr. Coderch's Brazilian apartment on April 6 and 11, 2017,

---

[8] "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.

to attempt service. After both attempts were unsuccessful, he notified the doorman that he would attempt service one final time on April 12, 2017, at 2:00 p.m. The bailiff returned on April 12 but again could not find Mr. Coderch. The bailiff thus left the summons and copies of the court documents with the doorman. On May 11, 2017, the STJ confirmed that Mr. Coderch had been properly served via the *hora certa* process, and on June 8, 2017, the Brazilian Ministry of Justice and Public Security returned the Letter Rogatory to the United States, indicating that Mr. Coderch had been validly served under Brazilian law.

After the Letter Rogatory was returned and filed with the District Court, the District Court reopened the case. Mr. Coderch moved to quash the foreign service of process under Rule 12(b)(4) of the Federal Rules of Civil Procedure, claiming that service was invalid under Brazilian law. He also moved to dismiss the petition to confirm the Arbitration Award, arguing, *inter alia*, that the Award cannot be recognized because it is not a money judgment and that recognition of the Award as requested by EGI would substantially modify the Award. The District Court denied both motions. It first held that it could not review the Brazilian court's determination that service of process had been carried out in accordance with Brazilian law; but even if it could, it found that Mr. Coderch had not presented persuasive evidence that service was insufficient. The Court then held that the

10

Award should be confirmed, rejecting each of Mr. Coderch's arguments. Mr. Coderch now appeals.

## II.

We turn first to the sufficiency of service of process in Brazil. When reviewing an order resolving a defendant's challenge to service of process, we review the district court's legal conclusions, including the district court's interpretation of foreign law in determining the sufficiency of service, *de novo* and its findings of fact for clear error. *Prewitt Enters., Inc. v. Org. of Petroleum Exp. Countries*, 353 F.3d 916, 920–21 (11th Cir. 2003).

In this case, EGI chose to serve Mr. Coderch pursuant to the Convention on Letters Rogatory and its Additional Protocol. Under the Convention on Letters Rogatory, "[l]etters rogatory shall be executed in accordance with the laws and procedural rules of the State of destination," here, Brazil. Convention on Letters Rogatory, art. 10. The Convention on Letters Rogatory further provides that "the State of destination shall have jurisdiction to determine any issue arising as a result of the execution of the measure requested in the letter rogatory." Convention on Letters Rogatory, art. 11. Here, a Brazilian court determined both that service via the *hora certa* procedure was warranted and that *hora certa* service had been carried out in accordance with Brazilian law. The District Court determined that it would be improper for the Court to review a decision by the Brazilian court that

11

service of process was carried out in accordance with Brazilian law. We also see no reason to disturb the Brazilian court's rulings. Principles of comity[9] counsel against reviewing a foreign court's determination regarding the interpretation and application of the foreign country's own laws—especially here, where the operative treaty confers jurisdiction over the issue to the foreign court.

In evaluating whether comity is appropriate, we consider "(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just." *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994) (internal citations omitted). We also consider "whether 'the central issue in

---

[9] International comity refers to "[t]he extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." *Hilton v. Guyot*, 159 U.S. 113, 163, 16 S. Ct. 139, 143 (1895); *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1030 (11th Cir. 2014). As the Supreme Court has explained:

> When . . . [a] foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is prima facie evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.

*Hilton*, 159 U.S. at 205–06, 16 S. Ct. at 159–60.

dispute is a matter of foreign law and whether there is a prospect of conflicting judgments.'" *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

Mr. Coderch argues that the Brazilian STJ's decision to authorize *hora certa* service is not entitled to comity because (1) it was the product of an ex parte proceeding in which he had no opportunity to defend himself, and (2) it was procured by fraud.  As to his first argument, Mr. Coderch claims that he lacked any fair opportunity to defend himself in the Brazilian court because, if he had appeared to challenge service or the *hora certa* procedure, he would have been automatically deemed served under Brazilian law.  Thus, he could not have challenged service in the Brazilian courts, like the District Court suggested, because to challenge service in Brazil would have been to waive service.

It is true that if Mr. Coderch had attempted to challenge service in Brazil, he would be deemed served under Brazilian law upon appearing in court.  But that is why, in cases dealing with constructive service such as the *hora certa* service at issue here, Brazilian law provides for the appointment of a lawyer from the Public Defender's Office to represent the interests of the individual who has not yet appeared before the Brazilian court.  da Costa Aff. ¶ 11, n.4, ECF No. 30-1.  In this case, a Special Guardian from the Public Defender's Office represented Mr.

Coderch in defending against service in the Brazilian tribunal. That Public Defender apparently made multiple challenges to the validity of service in the Brazilian court on Mr. Coderch's behalf, a fact Mr. Coderch does not dispute. As such, we cannot say that the Brazilian tribunal failed to offer Mr. Coderch a fair opportunity to defend against service in Brazil.

With respect to his second argument, Mr. Coderch contends that the evidence submitted to the STJ, which the STJ relied on in finding that Mr. Coderch was concealing himself from service and authorizing *hora certa* service, was false. Specifically, Mr. Coderch claims that the declaration presented to the STJ that stated that his *finca* in Paraguay did not exist was false and misled the STJ, and thus that the STJ's factual determination that Mr. Coderch was attempting to evade service was erroneous and, as a matter of Brazilian law, it should not have authorized *hora certa* service. The District Court, however, found no evidence of fraud, instead concluding that "ample evidence" substantiated the STJ's finding that Mr. Coderch was evading service of process. The District Court did not clearly err in so finding, and we are not convinced that EGI's (and the Paraguayan notary's) apparent inability to locate Mr. Coderch's *finca* in Paraguay rises to the level of fraud.

Accordingly, we hold that the District Court did not err in finding that considerations of international comity counseled against reviewing the Brazilian

14

court's determination that Mr. Coderch had been properly served in accordance with Brazilian law, especially since the Convention on Letters Rogatory commits jurisdiction of this issue to the courts of Brazil. Therefore, the District Court properly denied Mr. Coderch's motion to quash service under Rule 12.

III.

We turn next to Mr. Coderch's argument that the District Court erred in confirming the Arbitration Award. "On an appeal of a district court's decision to confirm or vacate an arbitration award, we review the district court's resolution of questions of law de novo and its findings of fact for clear error." *Rintin Corp., S.A. v. Domar, Ltd.*, 476 F.3d 1254, 1258 (11th Cir. 2007).

Both parties agree that this Arbitration Award is governed by the Inter-American Convention on International Commercial Arbitration (the "Panama Convention"), Jan. 30, 1975, O.A.S.T.S. No. 42, 1438 U.N.T.S. 245. Chapter 3 of the FAA, 9 U.S.C. §§ 301–307, implements the Panama Convention. Relevant here, § 302 incorporates by reference § 207 of the FAA, which provides that a federal court *must* confirm an arbitration award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."[10] 9 U.S.C. § 207. Article 5 of the Panama Convention lists

---

[10] The "said Convention" referred to in § 207 is the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3, the predecessor to the Panama Convention. There is

15

seven grounds for refusing to recognize an arbitration award: (1) incapacity or invalidity of the agreement, (2) lack of notice, (3) that the decision concerns a non-arbitrable dispute, (4) violation of the arbitration agreement or relevant law in carrying out the arbitration, (5) "[t]hat the decision is not yet binding on the parties or has been annulled or suspended," (6) "[t]hat the subject of the dispute cannot be settled by arbitration under the law of [the State of recognition]," and (7) "[t]hat the recognition or execution of the decision would be contrary to the public policy (*ordre public*) of [the State of recognition]."  Panama Convention, art. 5.  Mr. Coderch does not claim to be invoking one of these exceptions as a basis for refusing to confirm the Arbitration Award.

Instead, Mr. Coderch argues that the Award was not confirmable for two reasons.  First, he argues that the Award left undecided several issues relating to the purchase price that render the Award non-final.  And, he says, although the Panama Convention is silent on whether non-final awards may be confirmed, as a general matter we lack jurisdiction to confirm a non-final arbitration award.  *See Savers Prop. & Cas. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburg*, 748 F.3d 708, 717–19 (6th Cir. 2014) (holding that the court lacked jurisdiction to review an interim award that resolved only issues of liability and reserved for a later date the

---

no substantive difference between the two as relevant here.  Moreover, in incorporating § 207 into Chapter 3 of the FAA, § 302 specifies that "the Convention" shall mean the Panama Convention for purposes of Chapter 3.

question of computing damages). He asks us to send the dispute back to the arbitrator to decide these issues in the first instance. Second, he argues that confirming the Award as requested by EGI improperly modifies the Award from an order of specific performance to an award for money damages. We review each argument in turn.

A.

Coderch first argues that the Award cannot be confirmed because it did not fully resolve the parties' disputes regarding the purchase price. As explained above, the Arbitration Award provides a detailed formula, tracking precisely the language of Section 10 of the Shareholders' Agreement, for calculating the price of the shares that EGI was entitled to sell pursuant to its put right, based on the initial Preferred Purchase Price per share identified in the Award. The only thing the Arbitration Award does not do is perform the calculations. Despite this, Mr. Coderch claims that the Award is non-final because the formula fails to specify the currency in which the purchase is to be made—it provides as a starting point for the calculation a sum in UF, which is not a currency but an inflation index, and fails to specify a conversion date for purposes of converting the UF figures into an appropriate currency. He argues that EGI improperly calculated the amount owed to it under the Award by converting the UF amount listed in the Award to U.S. dollars, as opposed to Chilean pesos as the Shareholders' Agreement contemplates.

17

He claims that we must remand this dispute so that the arbitrator can decide the appropriate currency.

As an initial matter, we can find nothing in the Shareholders' Agreement that requires the shares purchased pursuant to the put right to be paid for only in Chilean pesos, as Mr. Coderch claims. The Arbitration Award certainly does not require as much, given that it directs the purchase price to be calculated in terms of UF. But regardless, EGI *did* initially convert the UF figure listed in the Award to Chilean pesos, before eventually converting it into U.S. dollars for purposes of confirmation in the District Court.

Moreover, the currency in which the Award is ultimately paid does not matter so much—as far as value goes—as long as the appropriate conversion date is used. That brings us to the parties' next disagreement. EGI converted the Award amount from UF to pesos to U.S. dollars using the exchange rate on the date that payment was due under the Award: January 23, 2012.[11] EGI argues this was appropriate because, according to the "breach day" rule, foreign arbitration awards should be converted to U.S. dollars on the date of the award. Mr. Coderch

---

[11] The arbitrator rendered a decision on January 13, 2012, requiring Mr. Coderch to purchase all of EGI's shares within ten *business days* from the date of the Award. That means that performance under the Award was due on January 27, 2012. In arriving at the January 23 date, EGI apparently counted ten total days, including Saturdays and Sundays, from the date of the Award. Nonetheless, this mistake does not affect our conclusion because, as explained below, we find that the proper conversion date is in fact January 13, 2012.

18

argues that this gives EGI an inflated award, and that the appropriate conversion date is the date of the "Preferred Closing" in the Shareholders' Agreement. He also argues that because the Award itself does not provide the conversion date, the Award is non-final, and we should send the matter back to the arbitrator to decide in the first instance.

While the Arbitration Award does not specify a conversion date, that omission alone does not render the Award non-final if the conversion date is established as a matter of law. The Supreme Court has laid out two options for determining the proper date on which to convert foreign currency into U.S. dollars. The first, established in *Hicks v. Guinness*, 269 U.S. 71, 46 S. Ct. 46 (1925), and known as the "breach day" rule, applies when the plaintiff's cause of action arises under U.S. law. *See Jamaica Nutrition Holdings, Ltd. v. United Shipping Co.*, 643 F.2d 376, 380 (5th Cir. April 24, 1981).[12] In that case, the applicable exchange rate is the rate that was in effect on the date that the plaintiff's cause of action arose. *Id.* In *Hicks*, a breach-of-contract case, that meant that German marks should be converted into U.S. dollars on the date the contract was breached. *See* 269 U.S. at 80, 46 S. Ct. at 47. The Supreme Court reasoned that at the time of breach the plaintiff had a claim under U.S. law for damages in U.S. dollars.

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding all Fifth Circuit precedent prior to October 1, 1981.

*Jamaica Nutrition Holdings*, 643 F.2d at 380 (quoting *Hicks*, 269 U.S. at 80, 46 S.

Ct. at 47).

The second method, based on the Supreme Court's decision in *Die Deutsche*

*Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S. Ct. 166 (1926), applies

when the suit is based entirely on an obligation existing under a foreign country's

laws and the debt is payable in that country's currency. *Jamaica Nutrition*

*Holdings*, 643 F.2d at 380.  In that case, the parties assume the risk of currency

fluctuations and the applicable exchange rate is the rate in effect on the date of the

final decree or judgment. *Humphrey*, 272 U.S. at 518–19, 47 S. Ct. at 166–67;

*Jamaica Nutrition Holdings*, 643 F.2d at 380.  This is known as the "judgment

day" rule.

To determine which rule is applicable, we look to the jurisdiction in which

the plaintiff's cause of action arose. *See In re Good Hope Chem. Corp.*, 747 F.2d

806, 811 (1st Cir. 1984).  This is a suit under the FAA to confirm an international

arbitration award.  Thus, the FAA, which implements the Panama Convention, is

the source of EGI's cause of action.  While the underlying dispute between EGI

and Mr. Coderch in arbitration regarding the breach of the Shareholders'

Agreement was governed by Chilean law, EGI's cause of action here derives

entirely from U.S. law, namely the right under the FAA to have an international

arbitration award confirmed by a U.S. court.  Therefore, because EGI's cause of

action arises under U.S. law, the District Court properly understood that the

purchase price owed to EGI under the Award should be converted to U.S. dollars

according to the breach day rule.

However, the District Court clearly erred in accepting the date suggested by

EGI—January 23, 2012—as the appropriate date for conversion under the breach

day rule. The breach day rule requires conversion using the exchange rate on the

date that the cause of action arose. A cause of action arises under § 207 of the

FAA as soon as an arbitration award "is made." *See* 9 U.S.C. § 207 ("Within three

years after an arbitral award falling under the Convention *is made*, any party to the

arbitration may apply to any court having jurisdiction under this chapter for an

order confirming the award as against any other party to the arbitration." (emphasis

added)); *see also Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,*

*Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 581 (2d Cir.

1993), *as amended* (May 25, 1993) (interpreting "made" in § 207 as referring to

when the award is actually decided by the arbitrator, and thus finding that the

three-year statute of limitations begins to run once the arbitration award is issued).

In other words, an arbitration award becomes confirmable under the Panama

Convention and the FAA as soon as it is issued. EGI thus had a cause of action

under the FAA as soon as the Arbitration Award issued in Chile on January 13,

2012. As such, the proper conversion date under the breach day rule is January 13,

2012.  The District Court therefore clearly erred in accepting EGI's calculations, which converted UF to pesos to U.S. dollars on January 23, 2012.

B.

Lastly, Mr. Coderch contends that the District Court should not have confirmed the Arbitration Award as requested by EGI because the Award was really an order of specific performance, forcing the controlling shareholders' compliance with Section 10 of the Shareholders' Agreement, and not an award of a sum of money.  He argues that enforcing the Arbitration Award as a money judgment gives EGI a windfall, allowing EGI to collect an inflated purchase price without any obligation to turn over the shares.[13]

Mr. Coderch is correct that the Arbitration Award is properly understood as ordering specific performance of the parties' obligations under Section 10— namely, the purchase by Mr. Coderch and the sale by EGI of EGI's shares of preferred stock.  As the arbitrator noted throughout the Award, EGI had sought forcible compliance with the terms of the Shareholders' Agreement.  And Section 10 of the Shareholders' Agreement makes clear that the parties contemplated the simultaneous transfer of stock for cash by providing that "*[a]t the time of each one*

---

[13] Despite having exercised its put right, EGI continues to hold onto the shares.  It represents here, as it did in the District Court, that it is willing and prepared to transfer the shares once Mr. Coderch makes the requisite payment.  EGI has chosen not to transfer the shares yet because EGI fears that it would substantially weaken its economic position if it had neither the shares nor the money to which it is entitled.

*of such purchases* [of preferred stock made pursuant to the put right], the respective number of relevant shares of Preferred Stock *shall be transferred* to the Put Buyer against full payment in cash for such shares" (emphases added). That simultaneous exchange of shares for money is what the arbitrator ordered. To the extent that the District Court enforced the Arbitration Award as a money judgment, the District Court erred.

That said, Mr. Coderch offers no reason why an arbitration award ordering specific performance, as opposed to money damages, is not confirmable under the Panama Convention. The Panama Convention makes no exception for the recognition of arbitration awards ordering specific performance. *See generally* Panama Convention, art. 5. And, as explained above, a district court can refuse to confirm an arbitration award only if one of the enumerated exceptions in the Panama Convention applies. Accordingly, we find that the Award was confirmable under the Panama Convention and the FAA.

The fact that the Award is an order of specific performance, as opposed to a money judgment, might be irrelevant for purposes of determining whether the Award is confirmable, but it *is* relevant to crafting the appropriate remedy. Because the District Court viewed the Award as a money judgment as opposed to an order of specific performance, it enforced only half of the Award: it ordered Mr. Coderch to pay the put price for EGI's shares but neglected to enforce the

23

corresponding requirement that EGI tender those shares upon payment. Instead of enforcing the Arbitration Award as requested by EGI, the District Court's order should have required Mr. Coderch to pay the purchase price set out in the Shareholders' Agreement and the Award *and* in exchange required EGI to tender its shares.[14] Because the District Court did not do this, it erred.

## IV.

In conclusion, we hold that while the District Court properly found that the Arbitration Award should be confirmed under the Panama Convention, the Court committed two errors in enforcing that award. First, it clearly erred by accepting EGI's calculation of the purchase price due under the award, which used the wrong conversion date. Second, it failed to fully enforce the Award by neglecting to order EGI to tender its shares upon payment, as EGI is required to do under

---

[14] To facilitate the transfer, the District Court could have then required both parties to tender their performance to the Clerk of Court, as is customary in cases of forced sales, rather than directly to each other. That way, once the Clerk receives the shares from EGI and the payment from Mr. Coderch, he or she could effectuate the simultaneous transfer of shares for money that the Shareholders' Agreement and the Arbitration Award contemplate. Such an approach would also ensure that neither party ends up with a windfall if the other reneges (as each party here worries the other will do) and would put to rest this never-ending game of chicken concerning who will perform first and risk ending up with nothing at all.

Of course, this still begs the question of how to enforce an order of specific performance if one of the parties still refuses to perform. Fortunately, the District Court has plenty of tools in its chest to deal with a party's failure to comply with the Court's own orders. For example, the District Court might set a specific date on which performance under its order is due, and provide that for every day after the deadline that the party refuses to comply, the District Court will impose a hefty monetary fine on the offending party. Those accumulating fines would then be enforceable as money judgments against the offending party.

Section 10 of the Shareholders' Agreement.  We therefore **VACATE** the District

Court's order and **REMAND** with the following instructions: (1) to recalculate the

purchase price of the shares using the January 13, 2012, conversion date; and (2) to

enter an order requiring both Mr. Coderch and EGI to perform their obligations

under Section 10 of the Shareholders' Agreement by paying the purchase price for

the relevant shares, after proper calculation and conversion, and tendering those

shares, respectively.

      **SO ORDERED.**